THE PEOPLE ex rel. FRANK HASBROUCK, Appellant, *v.* THE BOARD OF SUPERVISORS OF THE COUNTY OF DUTCHESS, ETC., Respondent.

Under the provision of the "Reform Ballot Law" (§ 35, chap. 262, Laws of 1890, as amended by chap. 296, Laws of 1891), prohibiting the placing of any mark upon a ballot with intent that it may be identified, and providing that if a ballot cast has upon it any mark placed upon it with such intent "by the voter, or any other person to his knowledge," it shall be void; in order to condemn a ballot, it is necessary to prove that the ballot was marked either by the voter, or by another with his knowledge, with his intent or the intent known to him of such other person, that it might afterwards be identified.

To prove the requisite facts, however, it is not necessary to call the voter, or any person acting in complicity with him, but the same may be proved like other facts by any competent evidence; nor is it necessary to show who the voter was who cast the ballot; it is sufficient if it be shown that the ballot was marked with the illegal intent by whomsoever cast.

The marks placed upon a ballot, or a series of ballots, may be of such character as of themselves to furnish strong proof that they were placed thereon for the purpose of identification, and with other circumstances, even slight, may establish the illegal intent.

Under the provision of said act (§ 31), providing for the determination by mandamus of the question as to the validity of a ballot claimed to be invalid, and prescribing the steps to be taken preliminary to the proceeding, the fact that the inspectors failed to write their names upon the ballot, will not alone, when the other prescribed steps have been taken, prevent or defeat the mandamus proceeding.

*It seems* that where, during or immediately after the completion of a canvass, a marked ballot is questioned as prescribed by the act, and a proceeding by mandamus is instituted as provided for, it is for the court to determine whether, under the circumstances of the particular case, there has been such a substantial compliance with the other requirements as to enable the relator to maintain the proceeding.

*It seems* that a candidate, intending to proceed by mandamus, should procure an alternative writ.

Where, however, a peremptory writ is applied for upon notice as required (Code Civ. Pro. § 2070), if the facts upon which the application is based are admitted, or not disputed, and are sufficient to authorize the writ, questions of law only are involved, and the writ may issue in the first instance.

Where a peremptory writ is issued, it must command precisely what, and no more than the party to whom it is directed, is legally required to do; if it requires more, while the court on application to quash may amend

(Code Civ. Pro. §§ 721, 722, 723, 1997), it may, in its discretion, quash the writ, and the exercise of this discretion is not reviewable h . ..

Where, therefore, the affidavits upon motion for a mandamus under said act set forth facts showing clearly that a portion of the ballots which were questioned, were marked for the purpose of identification, which facts were not disputed; but the facts stated as to the residue failed to show that the ballots were so marked, and there was no allegation that they were questioned during the canvass, and a peremptory writ was issued requiring the board of county canvassers to recount the votes and reject all of those questioned, which writ was quashed; *held,* that the writ was defective in that it required too much; and that the order quashing it was not reviewable here.

The writ was granted without notice to the board of canvassers; it appeared, and without objection made return submitting to the jurisdiction of the court. *Held,* that the objection of want of notice was only to be taken by the board and after such appearance and return it was too late for it to raise it.

(Argued October 3, 1892; decided October 18, 1892.)

APPEAL from order of the General Term of the Supreme Court in the second judicial department, made February 11, 1892, which affirmed an order of Special Term, dismissing a writ of peremptory mandamus.

The board of canvassers of Dutchess county canvassed the votes cast for the office of county treasurer at the general election held in said county on November 3, 1891, rejected certain ballots on the ground that they were marked for the purpose of identification, and declared the result and filed a certificate giving the office to Frank Hasbrouck, the relator, the democratic candidate, by a plurality of thirty-seven votes. A mandamus on the relation of Isaac W. Sherrill, the republican candidate, was issued, and in obedience thereto the board of canvassers reconvened and recanvassed the votes, and made and filed the statement of canvass, giving Mr. Sherrill a plurality of seventeen votes. Thereupon the relator applied for an order to show cause why a mandamus, under section 31 of the Ballot Reform Law, should not issue. A peremptory mandamus was issued to the effect stated in the opinion, which also states the material facts.

Further facts are stated in the opinion.

*Horace D. Hofcut* for appellant.     Justice BARNARD's decision nullifies the provisions of the ballot Reform Law as to marked ballots, and makes the law, and not the ballots, "void and of no effect." (129 N. Y. 395.)  Marking the official ballot and marking the paster ballot are both prohibited. (Laws of 1891, chap. 296, § 35.)  The provisions of the Election Law (Chap. 130, Laws of 1842), requiring inspectors to attach to statements of canvass "not only the defective ballots, but a sample of all others voted, with the writing thereon, showing the number of each kind cast * * *," has remained unchanged ever since. (*People ex rel.* v. *Bd. Canvassers*, 126 N. Y. 402.)  A peremptory mandamus was properly issued. (Laws of 1891, chap. 296, § 31.)

*R. F. Wilkinson* for respondent.  A peremptory writ of mandamus may issue only when the relator's right is clear in law, and there is no dispute about the facts.  If the facts are disputed, an alternative writ is the proper remedy. (Code Civ. Pro. § 2070 ; Wood on Mandamus, 31–39 ; *Nichols Case*, 129 N. Y. 435, 436, 442.)  These objections to the sufficiency of the moving papers could be taken at any time, even upon appeal. (*C. Bank* v. *Canal Commissioners*, 10 Wend. 27 ; *People ex rel.* v. *Batchellor*, 53 N. Y. 128–138 ; *People ex rel.* v. *Green*, 58 id. 295, 305.)

EARL, Ch. J.  By chapter 262 of the laws of 1890, as amended by the act chapter 296 of the Laws of 1891, a new system for the conduct of elections was introduced into this state. The main purpose of the system was to enable the voter so to cast his ballot that no person would know for what candidates he voted, and thus that he would be protected against intimidation and other improper influences.  For the first time in this state it was made illegal for a voter to cast a ballot which had in any way been marked for identification, and such ballots were rendered void and of no effect.  It is provided in section 35 that "no voter shall place any mark upon his ballot or do any other act in connection with a ballot with the intent that it may be identified as the one voted by him ; no person

shall place any mark upon or do any other act in connection with a paster ballot with the intent that it may afterwards be identified as having been voted by any particular person. When a ballot has been deposited in a ballot-box, upon which, or upon a paster affixed thereto, a writing or mark of any kind has been placed by the voter or by any other person to his knowledge, with the intent that such ballot shall afterwards be identified as the one voted by him, the same shall be void and of no effect." This section condemns a ballot, not only if it was marked for identification by the voter himself, but also if, with his knowledge or assent, it was marked for identification by any other person. Whether the ballot was marked by himself or by any other person, it is sufficient, in order to condemn it, to show his intent. When the ballot was marked by any other person, before it can be condemned, it must be shown that it was so marked with the voter's knowledge, either with his intent or the known intent of such other person that it might afterwards be identified. The facts requisite to condemn the ballot under these provisions can be proved by any competent evidence. They may be shown by the evidence of the voter, or of any other person placing the mark on the ballot, or by any competent evidence, even against the evidence of those two, sufficient to satisfy the judicial mind of the existence of the facts. The whole field of inquiry is open, as in any case where a question of fact is to be tried and determined. If the facts could be proved only by calling the voter, or some other person in complicity with him in placing the mark upon the ballot, it is manifest that these provisions of the ballot law would be substantially useless, as no other person could know by whom the ballot was cast; and thus the essential witnesses in nearly every case could not be produced. Nor can it be needful to show who. the voter was who marked or cast the ballot with illegal intent. It must be sufficient to show by any competent evidence that the ballot was marked with the illegal intent by whomsoever cast. The marks placed upon a ballot or upon a series of ballots may be such as of themselves to furnish strong and persuasive evi-

dence that they were placed upon the ballots for the purpose of their identification, and with other circumstances, even slight, they may establish the illegal intent.

While section 35 provides that such marked ballots " shall be void and of no effect," a speedy and summary proceeding for their condemnation is provided in section 31 as follows : " When an inspector of election or other election officer or duly authorized watcher shall, during a canvass of the votes, or immediately after the completion thereof, declare his belief that any particular ballot or paster affixed thereto has been written upon or marked in any way with the intent that the same may be identified, the inspectors shall write their names on the back thereof and attach it to the original certificate of canvass, and include in said certificate a statement of the specific grounds upon which the validity of such ballot is questioned. When the votes are to be estimated and the result declared by a board of county canvassers or other officers performing similar duties, such board or officers shall mention separately in the statement or certificate of canvass the number of votes thus questioned which were cast for each candidate, and the specific grounds upon which the same are claimed to be invalid as set forth in the original certificate of canvass. Such ballots shall be counted in estimating the result of an election, but within thirty days after the filing of the certificate declaring such result a writ of mandamus may issue out of the Supreme Court against the board of canvassers, or officers acting as such board by whom the ballots were counted, upon the application of any candidate voted for at the election, to require a recount of the votes ; and all questions relating to the validity of such ballots, and as to whether they were properly counted, shall be determined in such proceeding. All such ballots shall be preserved for at least one year, and until the questions raised by such writ shall be finally determined. Election boards and boards of canvassers shall be continued in existence for the purposes of such proceedings."

This section provides for the performance of several acts preliminary to the proceeding by mandamus. (1) An inspector

or other election officer or duly authorized watcher, must, during a canvass, or immediately after its completion, in substance, declare to the inspectors his belief that the ballot or paster was written upon, or marked for identification.    (2) The inspectors must write their names on the back of such ballot and attach it to the original certificate of canvass.    (3) They must include in such certificate a statement of the specific grounds upon which the validity of such ballot was questioned.    (4) The board of county convassers or other officers performing similar duties must mention separately in the statement or certificate of canvass made by them the number of votes thus questioned which were cast for each candidate and the specific grounds upon which the same were claimed to be invalid as set forth in the original certificate of canvass.    Are all these preliminary acts matters of substance which are required absolutely to be performed before a candidate can proceed by writ of mandamus?    Can the inspectors of election or the board of county canvassers prevent or defeat the proceeding by mandamus by neglecting or purposely omitting to write their names upon the ballots or to make the required statements?    The proper officers are under a duty to perform these preliminary acts, and if they do not perform them, they may be criminally prosecuted for their neglect or willful disregard of the requirements of the law.

These laws should be liberally interpreted so as to promote the ends for which they were enacted, and the courts should not permit their purpose to be defeated by the innocent neglect, chicanery or willful misconduct of election officers. The law condemns ballots marked for identification, and such marking strikes at the very root of the reform ballot system, and if during the canvass, some election officer or some authorized watcher who in a sense represents the candidates of his party questions the marked ballot on the ground of the marks, the first important step has been taken.    The other preliminary acts are devolved upon the election officers not representing or under the control of any candidate, and the courts in the mandamus proceeding must determine whether,

under the circumstances of the particular case, there has been such a substantial compliance with the statute as will enable the candidate complaining of marked ballots to maintain the proceeding.

A candidate intending to proceed by mandamus under section 31 should procure an alternative writ so that if there should be any dispute about facts that can be settled before the peremptory writ issues, and the opposing candidate should be permitted to intervene so as to protect his rights. If, however, a peremptory mandamus is applied for it must be upon notice (Code, § 2070), and then if the facts upon which the application is based are undisputed or admitted and are sufficient to authorize the writ, questions of law only are involved and the writ may issue in the first instance.

Having thus called attention to the law and the procedure under the law, I will now advert to the facts. The relator was the democratic candidate, and Isaac W. Sherrill the republican candidate for county treasurer in the county of Dutchess in November, 1891, and counting all the votes cast at the election the board of county canvassers certified that Sherrill was elected by a majority of seventeen. The relator claims that certain of the ballots cast for Sherrill were marked for identification and that if they are rejected he would have a majority of the legal ballots and would be entitled to the certificate showing his election. He therefore in due time obtained from a Special Term of the Supreme Court a peremptory writ of mandamus commanding the board of county canvassers to recount the ballots and reject those which he claimed were marked for identification. The writ was based on certain affidavits and upon the statement and certificate of canvass of the board of county canvassers, its certificate declaring the result of the election and all the statements and certificates of canvass of the inspectors of election for certain districts named, and it commanded the board of county canvassers to reconvene " and to recount the votes cast at said general election for said office of county treasurer, and on said recount to reject and not to count for the candidates named

thereon for the office of county treasurer all ballots that have been marked for identification and that have been so returned and certified, and particularly the eighteen marked ballots returned from the first district of the town of East Fishkill, the one marked ballot returned from the first district of the first ward of the city of Poughkeepsie, the four marked ballots returned from the second district of the town of Red Hook, and the thirty-one marked ballots returned from the third district of the town of Red Hook."

Besides the relator's affidavit, there were affidavits of Ogden, Kniffin, Williams, Rifenburgh and Grennon. In his first affidavit Ogden stated that he was an authorized democratic watcher at the polls in the first election district of the town of East Fishkill; that he was present at the canvass by the inspectors of the votes cast in that district; that during the canvass there appeared among the ballots which were counted eighteen ballots with straight republican paster-ballots attached to the face thereof, with the name of William Rowe, the republican candidate for justice of sessions, erased from each paster by a pencil mark drawn through it and the name of some other person who was not a candidate for the office of justice of sessions written at the foot of the paster; that some of the names so written were of persons who resided in the county of Dutchess; that one name was that of a person unknown to him, and one was John Doe supposed to be a fictitious person; that during the canvass of the votes he declared his belief that each of these marked ballots and the pasters affixed thereto had been written upon and marked for identification, and that he questioned each of them on that specific ground; that he had on the day he made his affidavit examined the eighteen marked ballots returned by the election inspectors of the district to the board of county canvassers and attached to their certificate, and that they are the identical ballots objected to and questioned as before stated; that all the names written upon the pasters were in the same handwriting, and in his opinion in the handwriting of Garrett Roach, with whose handwriting he was familiar; that Roach

was a republican worker at the polls in the district all the day of the election; that Charles W. Horton was also a resident of the district and a republican worker therein; that he, Horton, was present at the canvass of the votes by the inspectors, and when any such marked ballot appeared and was counted in the canvass, as the name of the person thus written thereon in pencil was read aloud, he entered the name so read in a memorandum book held in his hand; that he was informed and believed that Horton thus made the memorandum of the names for the purpose of ascertaining how many and what marked ballots had been cast at the election, so that he could pay the voters casting such ballots in pursuance of prior promises made to them, and that he was informed and believed that such payments were subsequently made by Horton. Kniffin and Williams each made an affidavit stating that he was a voter in the first district of Fishkill, and that before he voted Roach approached him and offered him a republican paster ballot, and asked him to vote the same; that he then and there erased from the paster the name of the republican candidate for justice of sessions, and wrote thereon with a pencil some other name, and handed the paster to him thus marked, and promised him that if he would vote the paster so marked, and if the same should come out of the ballot-box at the canvass of the votes, Horton would give him five dollars. Ogden made another affidavit that on election day Kniffen and Williams severally gave him the pasters so received from Roach, and stated to him what had taken place between them and Roach, and he attached the pasters to his affidavit. Rifenburgh and Grennon joined in an affidavit in which they stated that they resided at Madalin in the town of Red Hook in the county of Dutchess; that they knew republican leaders and workers who resided in Madalin, and that after the election, they had heard them boast " that some of their men had voted right by the marked paster ballots or tickets that were voted at said election in said districts by the marks that they put upon themselves."

The facts alleged in these affidavits were undisputed, and

there cannot be the least doubt that, as to the East Fishkill paster ballots, they showed that the pasters were marked for the purpose of identification, and to effectuate a scheme of bribery. No other purpose for marking them as they were marked can be conceived. The election of Rowe was not contested, and he could not be defeated. A different name was written upon each paster — names of persons not candidates for the office, and at least one name that of a fictitious person, and it is quite significant that all this was done upon pasters.

But this is not all. There was an official republican ballot in the first ward of the city of Poughkeepsie, headed by the name of the republican candidate for governor, with an ink line drawn above and under the name, and a check mark in ink opposite to it, and the inspectors indorsed upon that ballot " supposed to be a ticket marked for identification," but they did not write their names upon it. They, however, attached it to their certificate and made the statement required by section 31, stating that, during the canvass of the votes, it was questioned by an authorized watcher on the ground that it had been marked for identification. In the second district of the town of Red Hook there were four full republican paster ballots, on two of which Rowe's name was erased with a blue pencil, and again written at the foot of each paster with the same pencil, on one of which the name of Rowe was erased with a blue pencil, and on another the name of Calvin E. Pratt, another candidate, was erased with a black pencil and again written at the foot of the paster with the same pencil. It is impossible to conceive that these paster ballots were marked for any purpose except that of identification, and their marking seems to have been part of the same scheme worked in the town of Fishkill.

In the third district of Red Hook there were thirty-one ballots which are described in the statement made by the inspectors; each " was a republican official ballot, on the left margin of which, opposite the name of the office and candidate for attorney-general, appeared marks, as follows: " Blurred ink marks, as if made by a printer's quad. These have come to

be known as the quad ballots.  There is no allegation in the
record that these ballots were questioned during the canvass
by the inspectors.  Nor is there any allegation or proof in the
record that they were marked for identification.  The marks
themselves do not import design, and are by themselves just
as consistent with mistake as design.  If there was obtainable
any proof that these ballots were marked for an illegal pur-
pose, or as part of a general corrupt scheme, that proof should
have been placed before the court below as the basis of its
action, and should appear in this record.  Upon the case as
we now have it, a peremptory mandamus could not issue to
compel the board of county canvassers to reject these ballots.

The writ of mandamus was applied for and granted on the
7th day of December, 1891.  On the twelfth day of Decem-
ber the board of county canvassers made their return to the
writ at a Special Term of the Supreme Court, in which they
stated what they had done prior to the issuing of the writ, and
further, as follows : " That this board knows of no other duty
in reference to the counting of said ballots, except as may be
ordered by the court."  And thereupon the court ordered the
writ of mandamus to be quashed "without prejudice."  It
does not appear upon whose motion or upon what ground it
was quashed.  We are bound to assume that it was quashed
upon the motion of some party who had the right to be heard,
or by the judge holding the Special Term *ex mero motu*.  The
writ appears to have been granted without notice to the board
of county canvassers, as required by the Code; but we cannot
assume that it was quashed on that ground, as that was an
objection to be taken only by the board, and they appeared,
made their return and submitted themselves to the jurisdiction
of the court without objection.  It was then too late even for
them to make the objection that they had not received notice
of the application for the writ.  We must assume that it was
quashed upon some ground which, in the mind of the court,
the relator could obviate, as it was quashed "without preju-
dice" to his right to obtain another writ.  As it does not
appear in the record upon what ground it was quashed, we

must assume, for the purpose of review here, that it was quashed upon any ground available at the time. There was one obvious ground for quashing it, and that is, that the writ commanded too much, as it commanded the board of county canvassers, among other ballots, to reject and not count the quad ballots, which, as I have before stated, do not appear in this record to have been illegal. When a writ of peremptory mandamus issues, all judicial action has ceased, and the party commanded is bound to obey, and in default thereof he may be punished. He has no discretion to perform part of the acts commanded and to omit others; but he must obey the writ in the terms in which it was issued. The writ must command precisely what the party is required to do, and no more than he is legally bound to do. And if it commands more it may be quashed. Under the ancient practice a peremptory writ of mandamus, defective by commanding too much, or for not being sufficiently precise and definite, was not amendable, and the only remedy of the relator in such a case was to suffer his writ to be quashed and then obtain another. In High on Extraordinary Legal Remedies (§ 562) it is said that the better doctrine seems to be that no amendment should be allowed to the writ of peremptory mandamus, and when the writ commands more than the relator is entitled to the better practice is, instead of allowing an amendment, to set aside the order granting the writ and allow the relator to obtain an alternative writ. The authorities are abundant to show that the practice was to quash a peremptory writ which commanded too much. (*State ex rel., etc.,* v. *Township of Union,* 43 N. J. Law, 518; *State ex rel., etc.,* v. *Early,* 46 id. 479; *Hartshorn* v. *Ellsworth,* 60 Me. 276; *State* v. *Kansas City, etc., R. R. Co.,* 77 Mo. 143; *People ex rel.* v. *Baker,* 35 Barb. 105; *People ex rel., etc.,* v. *Supervisors of Dutchess Co.,* 1 Hill, 50; *Queen* v. *East & West India Dock Co.,* 2 El. & Bl. 466; *King* v. *Church of St. Pancras,* 3 A. & E. 535; *Reg.* v. *Tithe Comrs.,* 19 L. J. [Q. B.] 177.) But the former practice in reference to peremptory writs of mandamus has been modified in some juris-

dictions, and it has been held in some cases that the writ may, in the discretion of the court, be amended. Under the provisions of the Code of Procedure (§§ 721, 722, 723 and 1997) the court has ample authority to grant amendments either to an alternative or peremptory writ of mandamus in furtherance of justice. The Special Term, having the parties before it, could have amended this writ by striking out the command as to the quad ballots, and, if necessary, as to all the ballots except those from the town of Fishkill, and could have enforced the writ as thus amended. But where a writ is thus defective it rests in the discretion of the court whether it will amend or quash, and the exercise of that discretion is not reviewable here. A mandamus is sometimes likened to an injunction, and if an injunction be issued which is too broad in its terms, and a motion is made on that ground to vacate it, the court may undoubtedly amend it in the exercise of its discretion. But it may, on account of the imperfection complained of, entirely vacate it and leave the party to obtain another injunction proper in form and scope. If in such a case the court, instead of amending the injunction, should entirely vacate it, no one would contend that this court had the right to review the exercise of its discretion. So, too, a a mandamus has sometimes been styled a mandatory execution to carry into effect the final order of the court, and if an execution be issued in any case for too large an amount, or otherwise embracing too much, no one will question that it is in the discretion of the court to amend it or to vacate it entirely, leaving the party to take another execution; and with the exercise of that discretion this court would not interfere. This court was organized to review errors of law and not alleged errors in the exercise of discretion. (Code, § 1337.) In *People ex rel., etc.,* v. *Fairman* (91 N. Y. 385) the relator applied for a peremptory writ of mandamus, which the court denied. And then he made a motion to have the order modified so as to permit an alternative writ to issue, and we held that the last motion was addressed to the discretion of the court, and that its decision thereon was not reviewable here.

It may even be doubted whether the order of the Special Term quashing the writ without prejudice affected a substantial right of the relator. Here the certificate of the board of county canvassers declaring the result of the election as to county treasurer was filed, not earlier than the seventh day of December, and the relator had thirty days thereafter to procure his writ of mandamus. This writ was quashed on the twelfth day of December without prejudice, as we must assume, for the defect pointed out. He could immediately, then and there, or at any time within the thirty days, have obtained another writ proper in form, and thus the quashing of his writ without prejudice could have done him no substantial injury, so far as this record discloses. While, therefore, it is clear upon this record that the relator has suffered injustice, and that he was legally entitled, by taking the proper proceedings, to a certificate declaring his election, we do not perceive how we can give him any relief without departing from the settled practice of this court and exercising a jurisdiction not understood to be given to it.

The General Term had jurisdiction to review the order made at the Special Term, and to reverse or modify that order in case it came to the conclusion that the Special Term ought, in the exercise of a fair discretion, to have amended rather than to have quashed the peremptory writ. It is unfortunate to the relator that the time has now passed within which, under the statute, he could procure another writ of mandamus, and if he has any relief in this proceeding it is by application to the Supreme Court, and probably at the General Term, which, under the unfortunate circumstances in which he is placed, may so vacate and modify its order as to convert the peremptory writ of mandamus into an alternative writ, or to amend the peremptory writ by striking out the command as to ballots which do not appear to be illegal. We have no alternative but to dismiss this appeal.

Appeal dismissed, with costs.

All concur, except Maynard, J., not voting.

Appeal dismissed.