(43 App. Div. 303.)

### In re McDADE.

(Supreme Court, Appellate Division, Fourth Department.   October 13, 1899.)

1. ELECTIONS—BALLOTS—IDENTIFICATION—USE OF PASTERS.

Under Laws 1899, c. 473, § 6, requiring the custodian of primary elections to prescribe the form, size, and color of ballots, and providing that such ballots shall be on paper so thick that the printed matter shall not be legible from the outside when folded, and that the electors may procure such paper, and have ballots printed thereon, and that no ballots not conforming to such provisions shall be counted at the election, and section 7, providing that any ballot conforming in external appearance to the provisions of the act may be voted, but no ballot shall have any mark on the outside or be in any way marked for identification, ballots having pasted, over the names of a certain set of candidates for delegates to the city convention, the names of a rival set of candidates, are valid, where such pasters did not change the external appearance of the ballot.

2. SAME—CHANGING NAMES.

The fact that the names of certain candidates for delegates were obliterated with a pencil, and other names written in, where not in any way affecting the external appearance of the ballots when folded, does not invalidate them, where it does not appear that it was done for the purpose of identifying the ballots, though it might aid in so doing.

Hardin, P. J., dissenting.

Appeal from special term, Monroe county.

Application by James A. McDade to review the action of Patrick C. Dennis and others, constituting the Democratic board of primary election inspectors of the Second district of the Ninth ward of the city of Rochester, in counting votes cast at a primary election.   From an order made at a special term of the supreme court held in the city of Rochester (60 N. Y. Supp. 105), declaring certain votes illegal, the board of inspectors appealed.   Reversed.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and SMITH, JJ.

Frederick W. Smith and Milton E. Gibbs (Walter S. Hubbell, of counsel), for appellant.

John F. Kinney, for respondent McDade.

Frank J. Hone, for respondent Ernst.

McLENNAN, J. On the 19th day of September, 1899, the Democratic party of the city of Rochester, N. Y., held a primary election under and pursuant to the primary election law, being chapter 473 of the Laws of 1899 of the state of New York. Under the provisions of such statute, the duly-qualified voters belonging to the Democratic party, residing in the Second district of the Ninth ward of said city, were entitled to vote for five delegates to each of the following Democratic conventions, viz. the county, Third assembly district, and city conventions. Such voters were also, in conjunction with the Democratic voters of the other district of said ward, entitled to nominate candidates for the offices of supervisor, alderman, and constable of such ward, and to elect a ward committee consisting of nine persons. The regular ballots used by the voters of said primary election were such as were prescribed by the custodian of primary records (the county clerk in this case), and, as prescribed, conform to the requirements of the primary election law in all respects. Each of such regular ballots had printed upon its face, under the words, "Delegates to the County Convention," "Delegates to the Third Assembly District Convention," "Delegates to the City Convention," five names, respectively. There was also one name under the words, "For Supervisor," "For Alderman," and "For Constable," respectively; and under the words, "For Ward Committee," there were nine names,—twenty-seven names in all, arranged in a column and in the order above indicated. At said primary election there were two principal candidates for the nomination for mayor of the city of Rochester, viz. Mr. George E. Warner and Mr. Charles B. Ernst. The ballots which contained the names of delegates to the city convention favorable to the nomination of Mr. Warner for mayor were called "Warner Ballots," and those containing the names of delegates favorable to the nomination of Mr. Ernst were called "Ernst Ballots," and are so designated in this proceeding. Not only were the names of the delegates to the city convention different from such ballots, respectively, but that was substantially true of all the other names upon such ballots.

At the primary election in the district in question, 122 ballots were cast, and of such ballots 117 were concededly regular and legal in all respects. Sixty-two of that number were the regular "Ernst Ballots," so called, and contained the names of delegates to the city convention favorable to the nomination of Mr. Ernst for mayor; 55 were the regular "Warner Ballots," so called, and contained the names of delegates to the city convention favorable to Mr. Warner's nomination. Of the 5 remaining ballots which were cast, 4 were regular Ernst ballots, but 1 had upon its face a paster of light, thin

paper, just large enough to contain the names of the Warner delegates to the city convention, printed in the same type as those names were printed in the regular ballots. This paper was smoothly pasted over the names of the Ernst delegates to the county convention. Two of such ballots had upon them the same kind of paster, placed over the names of the Ernst delegates to the city convention. The fourth ballot had a paster of the same kind, containing the names of the ward committee which appeared upon the regular Warner ballot, pasted over the names of the ward committee appearing on the Ernst ballot. The other or fifth ballot was a regular Warner ballot, so called, but three of the names of the ward committee printed thereon were erased with a lead pencil and other names were written opposite such erasures upon the margin of the ballot.

At the close of the polls, upon opening the ballot box for the purpose of canvassing the votes cast, the inspectors found the ballots in the condition described. All of the ballots were similarly folded, and were all substantially the same in external appearance. From an inspection of the outside, the contents of the ballots could in no manner be ascertained, and the fact that upon such ballots were pasters could not be determined, if at all, except by the most careful examination and inspection. It is possible that by the sense of feeling, as the ballots were folded, it could be discovered that there was a paster upon one of them. Such discovery could not be so made as to either of the other ballots. When the ballots were canvassed by the inspectors, the four ballots having pasters upon them were protested by one of the duly-appointed watchers, and such fact is noted upon the back of each of these by writing thereon the words, "Ticket protested on account of paster," which statement was signed by the three inspectors. The ballot with the erasures and writing with pencil was protested on account of being marked with pencil, and such protest was noted in those words upon the ballot, and was also signed by the inspectors. No objection or protest was made upon the ground that such ballots were "marked for identification." The inspectors counted the three ballots upon which there were pasters containing the names of the Warner delegates to the city convention, and the one Warner ballot in which certain of the names of the city committee were erased and other names written in their place with a pencil, for the Warner city delegates. They counted the ballot which had a paster upon it containing the names of the Warner city committee, so called, pasted over the names of the Ernst city committee, so called, for the Ernst city delegates. This made the total number of ballots cast for the Ernst delegates to the city convention 63, and the total number cast for the Warner delegates 59. That result was duly returned by the inspectors, and a statement to that effect was made in the form prescribed by the statute, and was duly signed by the inspectors. The five so-called "split" or "marked" ballots were placed in an envelope, which was sealed, and then indorsed by the inspectors in the following words, viz.: "Ninth Ward Primary District, Rochester, Monroe County. This envelope contains ballots marked for identification of primary election held September 19, 1899, of above district. Section 8, subdivision 1, Primary

Election Law." Such indorsement was signed by the three primary inspectors. The envelope containing the five ballots and the statement of the result of the election was delivered by the inspectors to the custodian of the primary records, and the ballot box containing the regular ballots voted at such primary election was deposited with the clerk of the city of Rochester, all as required by law.

It was conceded by counsel upon the argument that the results declared by the inspectors, taken in conjunction with the result of the vote at the primary election in the other district of the Ninth ward, was the election of delegates to the Democratic city convention from the ward favorable to the nomination of Mr. Warner for mayor, and that if the five so-called "marked" or "split" ballots are void, or for any reason cannot be counted, the delegates to the city convention from the Ninth ward favorable to the nomination of Mr. Ernst are chosen.

On the 22d day of September, 1899, at a special term of the supreme court held in the city of Rochester, N. Y., upon the affidavit of J. A. McDade, an elector and resident of said district, and one Isaac M. Brickner, such affidavits being verified on the 21st day of September, 1899, and which contained the facts substantially as above set forth, and upon the application of the attorney for the petitioner, an order was duly made requiring the clerk of the city of Rochester forthwith to deposit with the clerk of the court the ballot box and ballots delivered to him as aforesaid. This order restrained the custodian of primary records from canvassing the statement filed with him by the inspectors, from preparing a certified statement of the result of such primary election, and from making up the roll of delegates to the Democratic city convention, until the further order of the court in the premises. Such order further directed the members of the board of primary inspectors above named to show cause, on the 23d day of September, 1899, at 10 o'clock a. m. of that day, at a special term of the supreme court, why they should not reconvene and recount the ballots cast at said primary election. Upon the return of the said order to show cause, the petitioner appeared in person, and by Mr. Frank J. Hone, his counsel, who also appeared for Mr. Ernst. The members of the board of primary inspectors also appeared in person and by their counsel, Messrs. Frederick W. Smith and Milton E. Gibbs, who also appeared for and represented Mr. Warner. The counsel for the inspectors presented and read affidavits setting forth the facts substantially as above recited, and the fact, which is not disputed, that none of the five ballots referred to was protested by any person when they were being canvassed, or at any other time, on account of having been marked "for identification," and that the only protest made was, "On account of paster," or "On account of being marked by pencil," as indorsed upon said ballots, respectively. It also appeared by the affidavits read on behalf of the inspectors that the ballots were canvassed in the presence of the watchers of both candidates and a large number of other persons, and when the result of the canvass was announced it was acquiesced in by all present. It further appeared, and is not disputed, that prior to holding the primary election in question the cus-

todian of primary records (the county clerk) advised the electors of the city of Rochester and of the primary election district in question, through the public press and some of them personally, that pasters could be used upon the ballots to be voted at the primary elections to be held in said city, and also that the voters had the right to erase any name on a ballot and write another name in its place; that he informed such electors and the public that such had been the interpretation of the law by eminent jurists, and that it was safe to rely upon such interpretation. It also appeared that such interpretation was commented upon and approved by the public press of the city. The affidavits contained no suggestion to the effect that the pasters or the pencil marks in question were used or put upon the ballots in question "for identification," or that there was any intent on the part of the electors who voted such ballots, or on the part of any other person connected with such election, to violate the provisions of the primary election law, or that in voting the ballots in question the voters did not act in entire good faith, and in reliance upon the advice given by the county clerk and through the public press as to the proper interpretation of the law.

These facts appearing, the court directed a recount by the primary election inspectors of all the ballots cast at the primary election held in the Second district of the Ninth ward. The ballot box and package containing the five so-called "split" or "marked" ballots were thereupon opened, and a recount was had in the presence of the court and the parties interested and their respective counsel. The ballots upon such recount and inspection were found to be of the number and in the condition above described. Thereupon, and after having heard counsel for the respective parties, the court found and determined:

"That said five ballots did not conform to the size, weight, thickness, and texture of the paper prescribed by the custodian of primary records, and that the same should be rejected, and not counted by said board of primary inspectors; * * * that said five ballots did not conform to the requirements of the primary election law, and that the same are void, and should not have been counted."

The order of the court further provided and directed said board of primary inspectors to reconvene and recount said ballots within 24 hours, to reject and not count the five so-called "split" or "marked" ballots, and to amend the statement of the canvass filed by them with the custodian of primary records in accordance with the result of such recount. From that order this appeal is taken.

No disputed question of fact is presented by this appeal. Concededly, the primary election in question was properly called and conducted. The size, color, weight, and texture of the paper prescribed by the custodian of primary records to be used for the ballots to be voted at said primary elections were in all respects in accordance with the requirements of the statute. Such paper was accessible to the electors, and sample ballots were duly furnished. All ballots offered to be voted conformed substantially in external appearance to the provisions of the primary election law. They were received by the inspectors, and deposited in the ballot box. At the close of

the polls, the ballots were accurately counted, and their exact conditions noted and stated by the inspectors.   There is no proof, outside of the ballots themselves, tending to show that any of the ballots voted were "marked for identification," or that any voter intended to violate any provision of law by the use of such ballots.   The questions presented are solely questions of law, and must be determined by reference to the statute itself.

The counsel for the petitioner urges that the five so-called "split" or "marked" ballots are void, and therefore should not be counted; four of them because they had pasters upon the face or inside, and one because of the pencil marks on the inside thereof.   It is said such ballots are void—First, because, by putting a paster or pencil mark on the face of the ballot, it is "marked for identification," within the meaning of the statute, and that it should be so held as a matter of law because of that fact, and independent of any question of intent or purpose or the circumstances connected therewith; second, because, by putting a paster upon a ballot, the "weight and texture" of the ballot prescribed by the custodian of primary records to be used for ballots are necessarily materially changed, and therefore cannot conform in those respects to the paper prescribed by such custodian. If either of the above propositions is resolved favorably to the petitioner, the order appealed from must be affirmed.

From an examination of the primary election law itself, and considering the public demand which led to its passage, and the evils which have heretofore attended the holding of caucuses of all political parties, of which the court may take judicial notice, it may be said that the purpose of the enactment was to provide a method by which only the members of a political party should vote at its primaries, to provide means by which such electors might cast their ballots conveniently and secretly without any interference or annoyance, to prevent bribery, intimidation, and corruption, and the exercise of any improper influence upon an elector which would tend to prevent him from voting for the delegates or candidates of his choice.   Sections 1 to 5 of the primary law relate to the application of the act, the definition and construction of certain words and phrases used therein, the enrollment of the electors, the time and place of holding primary elections and the notice to be given thereof, the selection and designation of persons and officers who should conduct the same, and their duties in the premises.   The sixth section of the act, which is the first section necessary to consider in this case, provides:

"The custodian of primary records shall, not later than twenty days prior to the holding of any official election provided for in this act, prescribe the size, color, weight and texture of the paper to be used for the ballots at such primary election, and prepare samples thereof.   The color of the ballots shall be such that those of each party shall be easily distinguishable from those of all other parties, and shall be such that the printing thereon shall be easily legible.   The paper shall be of such weight and texture as to make it impossible to read or decipher the printed matter on the inside of the ballots when it shall be folded.   Each ballot shall have printed or written upon its face the party name, the assembly district or ward number, if any, the election district number when the election district is a unit of representation, the names of the positions to be filled and the names of the persons voted for to fill such positions.   The size of the ballot shall be large enough for the printing thereon

of a complete set of names of all the positions to be filled at such primary election. All printing thereon shall be in black ink. Such sample ballots shall have the words 'Sample Ballot of the (specifying it) Party' printed thereon, and shall be exhibited for inspection during the hours within which the office of such custodian is open for business, and it shall be the duty of such custodian to furnish each member of the board of primary election inspectors and to any other elector applying for the same a sample of the ballot for such party. The custodian shall also furnish to the party committees or to electors applying therefor, at cost, the paper so designated to be used for ballots. Ballots to be voted on either of the two primary days may be provided by any person. Ballots not conforming to the provisions of this section shall not be counted at any primary election."

The section provides, in substance: The custodian must provide paper to be used for ballots of such size, color, weight, and texture as he may see fit, provided only that it shall be of sufficient size to permit the printing thereon legibly a complete set of names for all the positions to be filled at such primary elections, and the names of such positions, and it must be of such weight and texture as to render it impossible to read or decipher the printed matter on the inside of the ballot when folded. The custodian must also prepare a sample ballot of such paper, so designate it, and print thereon the name of the political party, and have the same on exhibition in his office for inspection for a certain length of time prior to any primary election. He is also required to furnish at cost, to any party committees or electors applying therefor, the paper prescribed by him. Committees or electors may procure the paper for use at the polls from the custodian, or may procure such paper as is prescribed from any other source, and place thereon the names of the positions to be filled, and the names of the persons to be voted for, either by causing them to be printed or written, and ballots of such character, no matter where or from whom·obtained or by whom prepared, by the express provisions of the section, are made legal ballots; provided only that they conform in external appearance to the ballots prescribed by the custodian, and do not have any printing or writing or other mark on the outside, and are so folded when offered to be voted that no part of the printed or written matter on the inside thereof shall be visible, and shall not be in any way "marked for identification," as provided in section 7 of said act.

Section 7 provides, in substance, that when an elector shall present himself to the board of inspectors, and declare his desire to vote, if he be duly enrolled, the inspectors shall deliver to him, unfolded, one of each of the ballots of his party; that thereupon the elector shall retire into one of the booths; that upon leaving such booth he shall be permitted to vote by delivering to one of the inspectors any ballot which conforms in external appearance to the provisions of this act, folded in such way that none of the printed or written matter on the inside shall be visible. Section 7 further provides: "No. ballot which shall have any printing, writing or mark on the outside thereof shall be received. No ballot shall be in any way marked for identification."

So far as we have been able to discover, those are the only restrictions placed upon the elector in the exercise of his right to vote at any primary election of the party to which he belongs. It

will be observed that the statute does not in express language pro-
hibit the elector from voting a ballot which may be identified by an
examination of the contents or inside of the ballot, or even from vot-
ing a ballot where from such examination it may be absolutely deter-
mined that such ballot was cast by a particular elector. In fact, the
statute in terms points out how this may legally be done. The elector
may procure paper of the size, color, weight, and texture prescribed
by the custodian, and with his own hand write any one or more of
the names of the persons to be voted for, avoid making any mark
upon the outside, fold it properly, and he has a ballot which in all
things conforms to the provisions of the statute, and yet one which
can be identified at sight by a watcher or other person when the bal-
lots are canvassed, because on such ballot is the handwriting of the
person voting the same. So, too, a ballot may be furnished to the
elector by a candidate, with some or all of the names thereon written
by him, or one name upon the ballot written by the candidate and
another written by the elector. The ballot would conform to the
requirements of the law. The elector would be entitled to vote
the same, but again the identification would be complete. Again,
even if all the matter printed upon the ballot is legible and in black
ink, the names could easily be so arranged as to make identifica-
tion easy. In fact, innumerable ways might be suggested by which
a ballot conforming in all respects to the requirements of the statute
may be identified.

It is urged by the learned counsel for the petitioner that, if identi-
fication is made possible by the use of pasters, the ballot is void.
We think we would be unwarranted in ascribing to the legislature
an intent to prohibit identification of ballots by the use of pasters,
and to permit such identification in almost every other way, by rea-
son of what may appear on the inside or by the contents. An ex-
amination of the pasters and ballots which are the subject of con-
troversy here discloses the fact that, if identification were possible,
it is made much more difficult by the use of the pasters than if
either of the other methods suggested had been employed. The
paper used for the pasters was of the same color, weight, and texture
as was prescribed by the custodian for the regular ballots. The
names upon them were printed with the same-sized type and the
same-colored ink as were the names upon such regular ballot. Each
paster was of the same size as the space occupied by the same names
upon the regular ballot. There were no marks upon such pasters,
or upon the ballots upon which they were used, to indicate by whom
they were voted, or which would attract attention.

The use of paster ballots at elections held under the general elec-
tion law, ever since the enactment of such law, has been the subject
of much controversy in the courts, and has frequently received con-
sideration by the legislature of the state. In determining what was
the intent of the legislature, it is significant to note that by that law
the use of pasters upon ballots is prohibited except in particular in-
stances, while the law under consideration contains no such prohibi-
tion. Under the general law, the form of the ballot prescribed is
such as to make the use of pasters unnecessary, and, except in very

rare cases, not even desirable, on the part of any elector. The form of the ballot prescribed by the primary election law is such that, if the use of pasters is prohibited, an illiterate elector may easily be, in effect, denied the right to participate in a primary election. In the case at bar the regular ballot contained the names of 27 persons, and the names of 7 different places or official positions. A voter might receive a ballot from any person before going to the polling place, and be content to vote for all the persons named thereon, except, perchance, the ward committee. Under those circumstances, is he required to procure paper of the character prescribed by the custodian, have the entire ballot reprinted, only changing the names of the ward committee, or must he procure all the names to be written? If not, may such elector not place a paster containing the names of the ward committeemen whom he desires to vote for over the names of such committeemen appearing upon the regular ballot? If he may pursue the latter course, he would be able to vote. Either of the others would substantially disfranchise such elector, and to no purpose; because, as before said, the identification of such ballot is as complete, and even more complete, when the names are written as when the paster is used.

The law is well settled that a statute which restricts or impairs the right of an elector in the exercise of the elective franchise should be strictly construed in favor of the elector, and in such manner as to secure to him, if possible, the right of suffrage. It is concluded that by the provisions of the primary election law the use of pasters is not prohibited, unless by their use the ballot is "marked for identification." It is unquestionably true that under the provisions of section 7 of the act, which provides that "no ballot shall be in any way marked for identification," the use of pasters may render the ballots on which they are placed illegal. If it should appear that a paster of any kind or a mark of any kind was put upon a ballot for the purpose of identifying the same, clearly such ballot would fall within the prohibition. It would be of no significance, however, that such identification was by paster rather than by the use of any other device. If an elector should write the names of the candidates upon the ballot, and should spell the name of a particular person wrong, for the purpose of having such ballot identified, it would render it void. So, if the names written upon a ballot should be arranged in a particular order for the purpose of identifying it, that would be a violation of the statute. In short, it may be said that any device adopted for the purpose of identifying ballots cast at a primary election, whether such device consists of writing, printing, spelling, or in using pasters, will render such ballots illegal. It is believed, however, that such purpose must be proven as any other question of fact; the use of a paster ballot is not, of itself, sufficient proof of the fact. People v. Dutchess Co. Sup'rs, 135 N. Y. 522, 32 N. E. 242. In the case at bar, as before stated, there is nothing to indicate that such was the purpose of the electors who voted the five ballots in question; and there is no evidence showing, or tending to show, that such electors were induced to use such ballots by any other persons in order that they might be identified. We think the case is wholly devoid

of facts or circumstances which show, or tend to show, that either of the five ballots in question was "marked for identification."

It is significant in this connection to note that, when the ballots were being canvassed in the presence of the representatives of all the interested parties, the objection was not made that the ballots in question "were marked for identification." Nothing of the kind was suggested. They were simply "protested on account of pasters." It is doubtful if such protest is sufficient to present the question as to whether such ballots were marked for identification or not. People v. Shaw, 133 N. Y. 493, 31 N. E. 512; People v. McKenzie, 66 Hun, 265, 21 N. Y. Supp. 279.

· Section 7 of the act provides that, although ballots be marked for identification, they shall nevertheless be counted; but, in case any duly-authorized watcher shall declare his belief that they were thus marked, the inspector shall write upon the back thereof, "Objected to because marked for identification," and then inclose them in an envelope properly indorsed, and file the same with the custodian of primary records; and then the court may, upon review, inspect the same, and determine from such inspection, or from any other competent evidence, whether such ballots were in fact "marked for identification" or not, and, if found to have been so marked, declare them void. Having reached the conclusion that the evidence is wholly insufficient to establish the fact that the ballots in question were "marked for identification," it is unnecessary to determine the effect of the failure to object to such ballots on the specific ground that they were so marked, and that they were not indorsed as required by the statute in such case.

Did the ballots in question conform to the requirements of section 6 of the act in respect to size, color, weight, and texture? If not, they cannot be counted. The provision of the statute is as follows: "Ballots not conforming to the provisions of this section shall not be counted at any official primary election." As before seen, the color of the paper prescribed by the custodian is entirely within his discretion. As to size, his discretion is only limited by the requirement that such ballots shall be of sufficient size to contain the matter to be placed thereon, if printed legibly. So, too, the custodian may prescribe, in his discretion, paper of any weight or texture for use as ballots, provided only it shall be impossible to read or decipher the printed matter on the inside of the ballot when it shall be folded. Concededly, the paper prescribed by the custodian conformed in all respects to the requirements of the statute. Nothing that was done to the ballots in question changed their character or characteristics in the respect last alluded to. The color was not changed. They remained of sufficient size to permit the printing thereon of the names of all persons to be voted for, and the designation of the official positions to be filled, and, after the pasters were placed upon the ballots in question, it was still "impossible [as before] to read or decipher the printed matter on the inside of the ballot when folded." It was not claimed by the counsel for the petitioner that the ballots used did not conform in all respects to the requirements of the law, save in one particular, to wit, that by the addition of the paster the ballots

when voted were, by reason of such addition, of different weight and texture than were prescribed by the custodian of primary records. The weight and texture prescribed were only to prevent the printed matter on the inside from being read or deciphered when the ballot was properly folded.    This purpose, by the addition of the paster, was not in any manner interfered with.

Did the legislature intend to provide that a particular person should be authorized to prescribe the kind of paper for ballots to be voted at a primary election, and by express terms authorize the electors, after an inspection of the same, to procure like paper from any source, and then, in effect, provide that, in case such elector should procure paper that was a little lighter or a little heavier or of somewhat different texture, and used the same for the purpose of voting at a primary election, the ballot so voted should be void, notwithstanding the paper used in all respects met the purpose of the requirement, which is that it shall be of such character as to prevent the contents of the ballot from being read or deciphered when properly folded?    The words of the section, if taken alone, are not susceptible of such construction, and, if the entire scope and purpose of the statute be considered, such an intention cannot be discovered. On the contrary, by reference to section 7 of the act, we find it is expressly provided that all ballots which conform in external appearance to its provisions, and are folded in such way that none of the printed or written matter on the inside thereof is visible, are to be received by the primary inspectors, and are to be counted, unless such ballots are "marked for identification."    If an inspector should take a ballot from a voter which was not of the color or size prescribed, or made of such paper that the contents could be seen when the ballot was folded, when canvassing the ballots, it would be the duty of the inspectors to reject such ballot, and not to count the same.    If an elector should offer to vote such a ballot, it would clearly be the duty of the inspector to refuse to receive the same.

As we have seen, the ballots in question did conform in external appearance to the requirements of the act.    The color was right. The size was sufficient to contain all the matter which was to be printed thereon.    The weight and texture were such as to make it impossible for a person to read or decipher the contents when the ballot was folded, and, in addition, when such ballot was handed to the inspector, its external appearance substantially conformed in all respects to the provisions of the act.    It is unquestionably true that, if there should be placed upon a ballot a paster of such a character as to materially change the external appearance, it would be void, and could not be counted; but in that case it would be the duty of the inspectors, if its condition was observed, to refuse to receive such ballot from the voter.

As before said, the purpose of the primary election law is not to prevent the voting of ballots which can be identified, but its chief purpose is to secure secrecy to the voter in the discharge of his duty as a citizen, and to provide a means by which such duty may be performed without interference or molestation from any source, and also to prevent the use of ballots which are "marked for identifica-

tion." The conclusion is reached that the ballots in question complied substantially with the requirements of the statute, and are in all respects valid; that they were properly canvassed and counted by the primary election inspectors; and that the statement of such canvass, made and signed by such inspectors, conformed in all respects to the facts, and correctly stated the result of the primary election held in the Second district of the Ninth ward of the city of Rochester on the 19th day of September, 1899. It follows that the order appealed from should be reversed, and the injunction vacated, but, as the questions are new, without costs to either party.

Order reversed and injunction vacated, without costs to either party. All concur, except HARDIN, P. J., who dissents.

HARDIN, P. J. (dissenting). On the 2d day of May, 1899, the legislature, by chapter 473, amended chapter 179 of the General Laws of 1898, known as "An act in relation to enrollment for political parties, primary elections, conventions and political committees," relative to the enrollment for and holding of primary elections. In the first section of the act of .1899 it is provided that the short title of the act shall be the "Primary Election Law." In the sixth section of the act the duty of the custodian of primary records is declared in the following language, to wit:

"The custodian of primary records shall, not later than twenty days prior to the holding of any official primary election provided for in this act, prescribe the size, color, weight and texture of the paper to be used for the ballots at such primary election, and prepare samples thereof. * * * The paper shall be of such weight and texture as to make it impossible to read or decipher the printed matter on the inside of the ballot when it shall be folded. Each ballot shall have printed or written upon its face the party name, the assembly district or ward number if any, the election district number when the election district is a unit of representation, the names of the positions to be filled and the names of the persons voted for to fill such positions."

The statute, in prescribing the size of the ballots, seems to provide for printing matter thereon. It is in the following language, viz.:

"The size of the ballot shall be large enough for the printing thereon of a complete set of names for all the positions to be filled at such primary election. All printing thereon shall be in black ink."

To enforce a compliance with the provisions of the section from which the quotation has just been made, further and definite language is used in the provision which reads, viz.: "Ballots not conforming to the provisions of this section shall not be counted at any official primary election." This language seems to inhibit the use of ballots which in any way or manner do not conform to the provisions of the section, and seems broad enough to inhibit the use of a ballot which has, in any way, been made to vary in size, color, weight, and texture of the paper prescribed by the custodian. It seems, therefore, that a ballot which fails to conform to the size prescribed, or to the color prescribed, or to the weight and texture of the paper prescribed by the custodian, ought not to be counted. Unless such effect is given to the language, "Ballots not conforming to the provisions of this section shall not be counted at any offi-

cial primary election," an exact and strict obedience to the statute is not enforced.

In section 7 a further inhibition and regulation is prescribed, and it is in that section declared, viz.: "No ballot shall be in any way marked for identification." The methods, the schemes, the inventions, for marking for identification of ballots have been numerous and ingenious. It needs no argument to demonstrate that a ballot, the face of which has once been printed upon and covered with names of candidates for office, or for delegates, if covered by means of a paster, can be identified and distinguished from one not so made to carry a paster; and it is not too much to say, as matter of law, that a ballot that has once been used to carry the names in print of one set of delegates, which is subjected to the further incumbrance of carrying names printed upon a paster, and that paster attached to the ballot, has been marked for identification. When such conclusion of law is derivable from an actual inspection, —from the physical condition of the ballot,—it becomes the duty of the inspectors to declare that the ballot does not conform to the provisions of section 6; and it also, by that section, becomes their duty to declare that such ballots "shall not be counted at any official primary election."

In a subsequent section (8), it is expressly provided, viz.: "All questions touching the validity of ballots or their conformity with the provisions of this act shall be determined by a majority vote of the board of primary inspectors." Therefore it was the duty of the board, or a majority thereof, to determine whether the ballots conformed to the requirements of the statute; and it is inferable from the provisions of the statute that it was the intention of the legislature to declare ballots void that do not conform in every respect to the prescribed conditions. People v. Board of Canvassers of Richmond County, 156 N. Y. 36, 50 N. E. 425; People v. Board of Aldermen of City of Buffalo, 157 N. Y. 434, 52 N. E. 181.

In section 8 is found a provision, viz.:

"When a ballot is not void, and a primary election inspector or a duly authorized watcher shall, during the canvass of the vote, declare his belief that any particular ballot has been written upon or marked in any way for the purpose of identification, the inspectors shall write on the back of such ballot 'Objected to because marked for identification,' and shall specify over their signatures upon the back thereof the mark or markings upon such ballot to which objection is made."

Whenever the inspectors shall reject "as void" any ballot, it is made their imperative duty to write "the reason for such rejection" on the back thereof. Such writing thereon is to be by the chairman of the inspectors or by an inspector designated by him.

In section 11 of the act jurisdiction is conferred to review "any action or neglect of the officers or members of a political convention or committee, or of any inspector of primary election, or of any public officer, or board, with regard to the right of any person to participate in a primary election"; and it is expressly declared by statute that the review may be by mandamus or certiorari. Further power is conferred upon the supreme court, or any justice

thereof, within the judicial district, or any county judge within his county; and it is expressly declared in the statute that such court or such officer "shall have summary jurisdiction, upon complaint of any citizen, to review such action or neglect." The statute provides that the court or officer reviewing such action or neglect shall consider, "but need not be controlled by, any action or determination of the regularly constituted party authorities upon the questions arising in reference thereto, and shall make such decision and order as, under all the facts and circumstances of the case, justice may require." When the parties appeared before the special term, which made the order which is brought here for review, there seems to have been a full and free presentment of the questions arising in respect to the ballots mentioned in the proceedings, and a submission of the questions for determination, and, although the petition was not as full and ample as it might have been made, the record shows that the questions that are now sought to be reviewed were raised in the special term and determined by it. Before that determination was made, the learned justice who presided patiently heard and deliberately considered all the questions that are necessarily involved in the decision which we are called upon to review. A clear and able opinion was prepared and delivered at special term, and fortified with authorities applicable to some of the questions involved in the reasoning given, and that opinion and the views already expressed lead me to the conclusion that the action of the special term should be sustained.